## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EAST YARD COMMUNITIES FOR ENVIRONMENTAL JUSTICE, 2317 South Atlantic Boulevard Commerce, CA 90040, IRONBOUND COMMUNITY CORPORATION, 317 Elm Street Newark, NJ 07105, SIERRA CLUB, 2101 Webster St Suite 1300 Oakland, CA 96412<br><br>　　　　Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, in his official capacity as Administrator of the Environmental Protection Agency, Mail Code 1101A 1200 Pennsylvania Avenue, N.W. Washington, D.C. 20460<br><br>　　　　Defendants. | Civ. No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.　　Plaintiff nonprofit groups East Yard Communities for Environmental Justice, Ironbound Community Corporation, and Sierra Club seek to compel Defendants U.S. Environmental Protection Agency and Michael S. Regan, Administrator of the U.S. Environmental Protection Agency, (collectively, "EPA") to complete the decade-late review and revision of the performance standards and other requirements for large municipal solid waste incineration units as required by the Clean Air Act. 42 U.S.C. § 7429(a)(5).

2. The Clean Air Act classifies large municipal solid waste incineration units – also referred to in EPA regulations as large municipal waste combustors ("large MWCs") – as incinerators that burn 250 tons per day or more of municipal solid waste. 42 U.S.C. § 7429(a)(1)(B). Burning solid waste causes the release of many toxic pollutants including particulate matter, lead, carbon monoxide, and nitrogen oxides. Indeed, large MWCs are some of the highest emitters of pollutants in their communities, many of which are environmental justice communities already overburdened with toxic facilities.

3. The 1990 Amendments to the Clean Air Act require EPA to establish "performance standards and other requirements" for solid waste incineration units by statutory deadlines and, once established, then require EPA to review and revise the standards at 5-year intervals. 42 U.S.C. § 7429(a)(1), (5).

4. In the 30 years since the enactment of these amendments, EPA has established or revised its standards for large municipal solid waste incinerators only twice, in 1995 and 2006.

5. EPA's most recent review and revision of these standards was thus due five years after 2006, in 2011. As of the date of this filing, EPA's review and revision of these standards is now ten years overdue.

6. Accordingly, Plaintiffs seek both a determination that EPA's failure to review and revise these incinerator standards as required by 42 U.S.C. § 7429(a)(5) violates the Clean Air Act, and an order compelling EPA to take this required action in accordance with an expeditious deadline set by this Court.

**JURISDICTION AND VENUE**

7. This action arises under the Clean Air Act, 42 U.S.C. § 7429(a)(5). This Court has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a)(2), 28 U.S.C. § 1331, and 28 U.S.C. § 1361.

8. This Court may order EPA to perform the requisite acts and duties, may issue a declaratory judgment, and may grant further relief pursuant to 42 U.S.C. § 7604(a); the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and 28 U.S.C. § 1361.

9. Plaintiffs have a right to bring this action pursuant to the Clean Air Act, 42 U.S.C § 7604(a)(2); 28 U.S.C. § 1361; and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

10. By certified letter to Administrator Regan posted on August 19, 2021, and received on August 23, 2021, Plaintiffs gave notice of this action as required by 42 U.S.C. § 7604(b)(2) and 40 C.F.R. § 54.1-1.3.

11. Venue is vested in this Court under 28 U.S.C. § 1391(e) because Defendants reside in this District. 28 U.S.C.A. § 1391(e)(1).

## PARTIES

12. Plaintiff **East Yard Communities for Environmental Justice ("EYCEJ")** is a 501(c)(3) environmental health and justice non-profit membership organization founded in 2001 and located in Long Beach, California. EYCEJ's mission is to create a safe and healthy environment for communities that are disproportionately suffering the negative impacts of industrial pollution. EYCEJ facilitates various community programs to promote its mission in East Los Angeles, Southeast Los Angeles, and Long Beach. This work includes regular community events, a community garden program, the Social Justice Research Collaborative, and Youth in Action, where students engage with environmental health and justice issues.

13. EYCEJ advocates against incineration in the East Los Angeles, Southeast Los Angeles, and Long Beach region of California and played an integral role in advocacy against an incinerator in Commerce, California, which ultimately closed in June 2018. EYCEJ also worked against a bill in the California legislature that would have allowed incinerators to receive renewable energy credits. EYCEJ has met with city council members and other local officials to

discuss the community impacts of incineration. EYCEJ also engages in public education campaigns about zero-waste, zero-pollution, and cleaner waste management practices.

14. Plaintiff **Ironbound Community Corporation ("ICC")** is a 501(c)(3) nonprofit organization, founded in 1969, and located in the Ironbound neighborhood of Newark, New Jersey. ICC is the largest comprehensive social services provider in Newark's East Ward, serving residents of the Ironbound neighborhood through children's and family programs, community organizing, and advocacy. ICC offers educational programs, including head start, pre-school, and afterschool programs for hundreds of children in the Ironbound neighborhood, as well as adult education programs. ICC runs a community center; an early learning center; and two family success centers, where ICC hosts its community development, environmental justice, and community gardens programs. All of ICC's centers are in the Ironbound community and near industrial facilities, including the Essex County Resource Recovery Facility, a large MWC.

15. For decades, ICC has advocated against the construction and, once built, the air emissions from the Essex County incinerator. ICC has engaged in several different anti-incineration campaigns, including legislative advocacy, policy development, direct engagement with the State regulatory agency, protests, and, when necessary, litigation. Further, ICC engages in public education campaigns to ensure that residents of the neighborhood are aware of ongoing risks imposed by emissions violations from the incinerator.

16. Plaintiff **Sierra Club** is a 501(c)(4) organization founded in 1892 and headquartered in Oakland, California. Sierra Club is incorporated in the State of California as a nonprofit public benefit corporation. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of Earth's resources and

ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

17. Sierra Club has engaged in anti-incineration advocacy, including advocacy about EPA's large MWC standards, specifically. Sierra Club filed suit against EPA when it missed its November 15, 1991, deadline to issue the initial large MWC standards, and filed another delay suit in 2001 in this District, when EPA failed to review and revise the standards by the statutory deadline. *See Sierra Club v. Whitman*, No. 01-1537 (D.D.C.). In 2006, Sierra Club filed a petition in the D.C. Circuit challenging EPA's 2006 large MWC standards. Sierra Club has also filed lawsuits and engaged in advocacy to ensure that EPA issues strong emissions standards for other categories of incinerators and has engaged in advocacy to reduce emissions from specific large MWCs.

18. Plaintiffs and their members and supporters live, work, travel, recreate, and engage in a wide variety of other activities near large municipal solid waste incinerators. *See* W. Amaya Decl. ¶¶ 5, 12 (attached as Exhibit 1); K. Amaya Decl. ¶ 1 (attached as Exhibit 2); Lopez Nuñez Decl. ¶¶ 5-6, 12 (attached as Exhibit 3); Carman Decl. ¶ 9 (attached as Exhibit 4); Fashho Decl. ¶ 4 (attached as Exhibit 5); Pierce Decl. ¶¶ 1, 7-8 (attached as Exhibit 6). For example, EYCEJ member Kimberly Amaya lives within 5 miles from the Southeast Resource Recovery Facility incinerator, and Sierra Club member Spencer Pierce lives within 3.5 miles of the Hennepin Energy Recovery Center incinerator. Plaintiff's members suffer exposure to injurious air pollution and additional harms to their health, recreational, aesthetic, educational, professional, and other interests due to breathing in the air pollutants emitted by these incinerators. Exposure to harmful air pollutants emitted by large municipal solid waste incinerators has adverse health effects which may include respiratory, neurological,

developmental, and reproductive harm; damage to bodily organs and the central nervous system; and cancer, as well as other health effects. Plaintiffs and their members and supporters are concerned that they are exposed to these harmful air pollutants in the locations where they live, work, travel, recreate, and engage in other activities. These reasonable concerns about their increased exposure from such activities and the resulting harms from such exposure diminish their enjoyment of activities and areas they previously enjoyed or would like to continue to engage in or use and thereby harm their recreational, aesthetic, educational, professional, and other interests. *See* K. Amaya Decl. ¶¶ 7-12; Lopez Nuñez Decl. ¶¶ 8, 12-15; Pierce Decl. ¶¶ 5-10. Incinerator emissions' adverse impacts on wildlife, plants, waters, land, communities, and ecosystems make it more difficult for Plaintiffs' members to observe, fish, cultivate, study, research, write about, or enjoy wildlife, plants, or ecosystems.

19.     In addition, Plaintiffs' efforts to ensure that the incinerators in their communities do not emit pollutants at levels that exceed what the Clean Air Act permits is hampered by EPA's failure to remedy the deficiencies in its large MWC standards, which allow incinerators to emit pollutants at levels higher than what the Clean Air Act allows. Plaintiffs cannot take enforcement actions themselves – or advocate for state agencies to take enforcement action – for emissions that violate Clean Air Act requirements but are nevertheless permitted by EPA's lax and deficient large MWC standards. *See* W. Amaya Decl. ¶ 10; Lopez Nuñez Decl. ¶ 10; Carman Decl. ¶ 6. Plaintiffs divert time and resources from their core programming in order to advocate for emission reductions that EPA's large MWC standards should – but do not – require. *See* W. Amaya Decl. ¶ 9; Lopez Nuñez Decl. ¶ 11; Carman Decl. ¶ 7.

20.     Plaintiffs and their members and supporters have been and will continue to be injured by EPA's lax regulation of large municipal solid waste incinerators and the Agency's

failure to update and strengthen these standards. Plaintiffs and their members are directly harmed from incinerator air emissions and other pollution because of adverse impacts to their health and wellbeing; adverse impacts to the use, enjoyment, and value of their property; adverse impacts to their ability to enjoy recreational activities outside unaffected by pollution; their inability to enforce violations of law that the Clean Air Act otherwise requires; and their diversion of resources to advocate for emission reductions that EPA's standards should mandate.

21. These injuries are actual, concrete, and irreparable. Plaintiffs and their members and supporters will continue to suffer harm from EPA's failure to strengthen its regulation of large municipal solid waste incinerators unless and until this Court provides the relief prayed for in this Complaint. EPA's failure to review and revise these regulations deprive Plaintiffs' members of the cleaner air that would result from stronger regulations. Consequently, EPA prolongs and increases Plaintiffs' members' exposure to injurious air pollutants and the related and resulting health, recreational, aesthetic, and other injuries as described above. Reviewing and revising the standards for large municipal solid waste incinerators, as required by Section 7429(a)(5), would reduce Plaintiffs' members' exposures; would reduce the related health, recreational, aesthetic, and other harms suffered by Plaintiffs' members; would ensure that Plaintiffs are able to enforce the emission limits that the Clean Air Act requires; and would allow Plaintiffs to focus their time and resources on their core programs instead of diverting them to advocate for emission reductions that EPA should require.

22. An order mandating that EPA review and revise its performance standards and other requirements for large municipal solid waste incinerators by a date certain would redress Plaintiffs' injuries.

23. Defendant **United States Environmental Protection Agency** is a federal agency charged with protecting public and environmental health, including through promulgation of regulations to implement the pollution-reduction provisions of the Clean Air Act.

24. Defendant **Michael S. Regan** is the Administrator of the EPA. In that role, he is charged with the duty to uphold the Clean Air Act and to take the required regulatory actions established therein.

## STATUTORY BACKGROUND

25. Congress enacted the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). Congress found the Act to be necessary in part because "the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare." *Id*. § 7401(a)(2). A "primary goal" of the Act is thus "pollution prevention." *Id*. § 7401(c).

26. The uncontrolled burning of solid waste releases a significant amount of toxic air pollution. To address this pollution, in 1990, Congress added Section 7429 to the Clean Air Act, requiring EPA to "establish performance standards and other requirements" for solid waste incineration units, including "numerical emissions limitations" for "particulate matter (total and fine), opacity (as appropriate), sulfur dioxide, hydrogen chloride, oxides of nitrogen, carbon monoxide, lead, cadmium, mercury, and dioxins and dibenzofurans." *Id*. § 7429(a)(4).

27. The performance standards established under Section 7429 must also include certain monitoring and operator training requirements. *Id*. § 7429(c), (d).

28. Section 7429 subdivides solid waste incinerators into several categories. For each category, Congress set a deadline by which EPA had to promulgate standards. *Id*. § 7429(a)(1).

The categories are: municipal waste combustors with capacity greater than 250 tons per day ("large MWCs"); municipal waste combustors with capacity less than or equal to 250 tons per day; units combusting hospital waste, medical waste, or infectious waste; units combusting commercial or industrial waste; and other categories of solid waste incineration units. *Id.* § 7429(a)(1).

29. Congress set different deadlines for the initial performance standards for each category of incinerator. Congress gave the shortest deadline for large MWCs, requiring EPA to promulgate standards for this category within 12 months of the enactment of the 1990 amendments, or November 15, 1991. *Id.* § 7429(a)(1)(B). The other categories, meanwhile, were given deadlines of 24 months, 36 months, or longer. *Id.* § 7429(a)(1)(C), (D), (E).

30. After promulgation of the initial standards, EPA then must "review and . . . revise" all such standards, including the large MWC standards, "[n]ot later than 5 years following the initial promulgation of [the] performance standards and other requirements under this section . . . and at 5 year intervals thereafter*." Id.* § 7429(a)(5).

FACTUAL BACKGROUND

I. **LARGE MUNICIPAL SOLID WASTE INCINERATORS AND THEIR PUBLIC HEALTH IMPACTS**

31. Municipal solid waste is waste collected from the general public and from residential, commercial, institutional, and industrial sources of paper, wood, yard wastes, food wastes, plastics, leather, rubber, and other combustible materials and non-combustible materials such as metal, glass, and rock. 42 U.S.C. § 7429(a)(5).

32. Combustion of solid waste causes the release of many toxic pollutants including nitrogen oxides; sulfur dioxide; hydrogen chloride; particulate matter; dioxins and furans; and metals, including lead, cadmium, and mercury. *See* Standards of Performance for New Stationary

Sources and Emission Guidelines for Existing Sources: Large Municipal Waste Combustors, 71 Fed. Reg. 27,324, 27,325 (May 10, 2006). Incinerators emit enormous amounts of these highly toxic pollutants. EPA estimates that in 2005, large and small incinerators in the United States emitted nearly 50,000 tons of nitrogen oxides, 4,600 tons of sulfur dioxide, 3,200 tons of hydrogen chloride, 780 tons of particulate matter, 15 tons of dioxins/furans, 5.5 tons of lead, 2.3 tons of mercury, and 0.2 tons of cadmium. Memorandum from Walt Stevenson, EPA, on Emissions from Large and Small MWC Units at MACT Compliance, to Large MWC Docket No. EPA-HQ-OAR-2005-0117-0164 (Aug. 10, 2007).

33. The vast majority of large MWCs are located in environmental justice communities, such as the communities that Plaintiffs EYCEJ and ICC serve. People who live in these communities often have underlying stressors that make them more susceptible to the detrimental health impacts of incinerator pollution, and this incinerator pollution contributes to the cumulative exposure to pollutants and toxics that they disproportionately face. *See* Tishman Environment and Design Center, *U.S. Municipal Solid Waste Incinerators: An Industry in Decline* (May 2019), https://www.no-burn.org/wp-content/uploads/2021/03/CR_GaiaReportFinal_05.21-1.pdf.

*34.* Pollutants emitted from large MWCs pose a significant threat to public health and safety. Exposure to particulate matter, mercury, lead, dioxins/furans, nitrogen dioxide, hydrogen chloride and sulfur dioxide can cause serious acute and chronic health effects.

35. Particulate matter exposure can adversely affect lung and heart health. Particulate matter pollution has been linked to premature death in people with heart or lung disease, nonfatal heart attacks, irregular heartbeats, aggravated asthma, and respiratory issues such as irritated airways, coughing, and difficulty breathing. Children, elderly adults, and people with heart or

lung disease are the most likely to be affected by particulate matter exposure. EPA, *Health and Environmental Impacts of Particulate Matter (PM)*, https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last updated on May 26, 2021).

36. Lead is a toxic heavy metal that poses a danger to human health and ecosystems. Lead exposure can cause cardiovascular effects, decreased kidney function, and reproductive problems. EPA, *Learn About Lead*, https://www.epa.gov/lead/learn-about-lead (last updated July 15, 2021). Children six years old and younger are most susceptible to the effects of lead exposure, which may include behavior and learning problems, developmental delays, slowed growth, hearing problems, and anemia. *Id*. Pregnant women exposed to lead may experience serious health effects for their developing infant, including premature birth and a higher risk for miscarriage. *Id*. Lead in the air is particularly problematic because it can be inhaled and swallowed. EPA, Lead in Outdoor Air, https://www.epa.gov/lead/lead-outdoor-air (last updated on August 31, 2021). People, particularly children, can swallow lead dust that settles onto surfaces like soil, dust, and water. Lead in soil and dust does not decay or decompose. *Id*.

37. Mercury exposure may poison nerve tissue. EPA determined that developing fetuses and young children are particularly susceptible to the effects of mercury exposure, as mercury may impair brain and nervous system development, which can, in turn, impact cognitive thinking, memory, attention, language, fine motor skills, and visual spatial skills. EPA, *Health Effects of Exposure to Mercury*, https://www.epa.gov/mercury/health-effects-exposures-mercury (last updated on March 3, 2021).

38. Dioxins and furans have a range of human health effects. Furans are a diverse class of pollutants that are reasonably anticipated to be a human carcinogen. National Toxicology Program, 14th Report on Carcinogens, *Furan* at 1 (2016),

11

https://ntp.niehs.nih.gov/ntp/roc/content/profiles/furan.pdf. Dioxins are a group of toxic chemicals that share certain chemical structure and biological characteristics. EPA, *Learn about Dioxin*, https://www.epa.gov/dioxin/learn-about-dioxin (last updated on September 8, 2020). Health effects of dioxin include cancer, reproductive and developmental problems, damage to the immune system, and interference with the hormones. *Id.*

39. Carbon monoxide exposure reduces the amount of oxygen that can be transported in the blood stream to critical organs, such as the heart and brain. EPA, *Basic Information about Carbon Monoxide (CO) Outdoor Air Pollution*, https://www.epa.gov/co-pollution/basic-information-about-carbon-monoxide-co-outdoor-air-pollution#What%20is%20CO (last updated on June 7, 2021).

40. Nitrogen dioxide exposure can endanger the human respiratory system. Short term exposure can aggravate respiratory diseases and, particularly, asthma. EPA, *Basic Information about $NO_2$*, https://www.epa.gov/no2-pollution/basic-information-about-no2#Effects (last updated June 7, 2021). This aggravation causes other respiratory symptoms such as coughing, wheezing, and difficulty breathing, leading to hospital admissions and emergency room visits. Longer exposure can contribute to the development of asthma and increase susceptibility to respiratory infections. *Id.* Elderly people, those with asthma, and children are generally at greater risk of adverse health effects form nitrogen dioxide exposure. *Id.*

41. Hydrogen chloride can lead to throat, eye, and skin irritation. Long-term exposure can lead to respiratory problems. EPA, *Hydrochloric Acid (Hydrogen Chloride)*, https://www.epa.gov/sites/default/files/2016-09/documents/hydrochloric-acid.pdf (revised in January 2000). Inhalation exposure may cause eye, nose, and respiratory tract irritation, inflammation, and pulmonary edema. *Id.*

42. Sulfur dioxide exposure may harm the human respiratory system and impair breathing, particularly in people with asthma or children. High concentrations of sulfur dioxides may react with other compounds in the atmosphere to form small particles and contribute to particulate matter pollution.

## II. EPA'S DELAYED IMPLEMENTATION OF CLEAN AIR ACT SECTION 7429

43. EPA has consistently failed to meet its deadlines to review and revise the large MWC standards.

44. EPA missed its first deadline of November 15, 1991, to issue the initial standards for large MWCs. *See* 42 U.S.C. § 7429(a)(1)(B).

45. The standards were promulgated four years after that deadline, on December 19, 1995, after EPA was prompted by litigation. *See* Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources, 60 Fed. Reg. 65387 (December 19, 1995).

46. Pursuant to the Clean Air Act, EPA was required to review and revise the December 19, 1995, standards by December 19, 2000. However, EPA failed to meet that deadline.

47. After again being prompted by litigation, EPA issued a proposed revision to the standards on December 19, 2005, and finalized those standards on May 10, 2006. *See* Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Large Municipal Waste Combustors, 71 Fed. Reg. 27,324 (May 10, 2006).

48. The 2006 standards were due for review and revision on May 10, 2011. 42 U.S.C. § 7429(a)(5). Yet again, EPA failed to finalize – let alone propose – a rulemaking to review and revise those standards by that deadline. Nor has EPA proposed or finalized the required review and revision in the years since.

49. Accordingly, EPA's review and revision of these standards is more than 10 years overdue.

50. This is a violation of the "review and revise" provision of the Clean Air Act. 42 U.S.C.§ 7429(a)(5).

51. Further, this constitutes "a failure of the Administrator to perform an[] act or duty under the [Clean Air Act] which is not discretionary" and "agency action unreasonably delayed" within the meaning of the Clean Air Act citizen suit provision. 42 U.S.C. § 7604(a).

## CLAIM FOR RELEIF

### Violation of Section 7429(a)(5) of the Clean Air Act

52. EPA's ongoing failure to "review and, in accordance with [section 7429] and section 7411 of [the Clean Air Act], revise" the large MWC standards not later than five years after promulgation of the standards and at five year intervals thereafter, as required by Section 7429(a)(5), constitutes a "failure of [EPA] to perform any act or duty under this chapter which is not discretionary" within the meaning of Section 7604(a)(2) of the Clean Air Act.

53. Each day that EPA fails to take this legally required action, EPA commits new, additional, and ongoing violations of its duties under Section 7429(a)(5).

## PRAYER FOR RELIEF

54. WHEREFORE, Plaintiffs respectfully request that the Court:

(a) Declare that Defendant EPA's failure to review and revise the large MWC standards no later than five years after promulgation of the most recent standards constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of Section 7604(a)(2);

(b) Order Defendant EPA to review and, in accordance with Section 7429 and Section 7411, revise the large MWC standards pursuant to Section 7412(a)(5), by issuing a proposed

14

rule within eighteen months of the Court's Order and finalizing the rule nine months after such proposal;

(c) Retain jurisdiction to ensure compliance with this Court's decree;

(d) Award Plaintiffs the costs of this action, including attorneys' fees; and

(e) Grant such other relief as the Court deems just and proper.

DATED: January 13th, 2022                                   Respectfully Submitted,


  /s/ Khushi Desai
Khushi Desai (D.C. Bar No. 984119)
Earthjustice
1001 G St. NW, Ste. 1000
Washington, D.C. 20001
kdesai@earthjustice.org
(202) 745-5224

Jonathan Smith*
Jasmine Crenshaw*
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
jjsmith@earthjustice.org
jcrenshaw@earthjustice.org
(212) 845-7379

**Pro Hac Vice* application forthcoming

*Counsel for East Yard Communities for Environmental Justice, Ironbound Community Corporation, and Sierra Club*